648 F.2d 527
 105 L.R.R.M. (BNA) 3311, 107 L.R.R.M. (BNA) 2724,
90 Lab.Cas. P 12,410, 91 Lab.Cas. P 12,826,
1980-81 Trade Cases 63,663,
1981-1 Trade Cases 64,109
 CALIFORNIA STATE COUNCIL OF CARPENTERS, United Brotherhood
of Carpenters and Joiners of America, AFL-CIO, et
al., Plaintiffs-Appellants,
v.
ASSOCIATED GENERAL CONTRACTORS OF CALIFORNIA, INC., et al.,
Defendants- Appellees.
 No. 77-2323.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 15, 1980.
Decided Nov. 20, 1980.
Rehearing and Rehearing En Banc Denied May 22, 1981.
 
 Victor J. Van Bourg, Van Bourg, Allen, Weinberg & Roger, San Francisco, Cal., for plaintiffs-appellants.
 Kurt W. Melchior, Severson, Werson, Berke & Melchior, San Francisco, Cal., for Harold E. Shugart, Co.
 James P. Watson, Cox, Castle & Nicholson, Los Angeles, Cal., for defendant-appellee, Associated Gen. Contractors.
 Appeal from the United States District Court for the Northern District of California.
 Before SNEED, PREGERSON and ALARCON, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 
 1
 This is an appeal from an order of the district court granting defendants' motions to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.
 
 
 2
 Two carpenters' unions filed an antitrust action against a contractors' association for conspiracy to boycott union-signatory subcontractors. The complaint also charged breach of contract, various business torts, and violations of state antitrust laws. The district court granted the motion to dismiss on the ground that unions are barred from bringing antitrust actions "against an employer in the normal type of labor dispute." California State Council of Carpenters v. Associated General Contractors of California, Inc., 404 F.Supp. 1067, 1070 (N.D.Cal.1975). We find that the district court erred in dismissing appellants' claim for relief under the Sherman Act. As to appellants' remaining claims, however, we affirm the district court's order of dismissal.
 
 BACKGROUND
 
 3
 The California State Council of Carpenters is the collective bargaining agent for carpenters and their affiliated local unions with respect to master collective bargaining agreements governing the California carpentry industry. The Carpenters 46 County Conference Board is the collective bargaining agent for carpenters employed in the drywall industry. Together, these two unincorporated labor organizations ("Unions") filed a complaint in district court, on their own behalf and on behalf of their affiliated local unions and district councils.[1]
 
 
 4
 The complaint names as defendants the Associated General Contractors of California ("AGCC"), each of its individual members, and one-thousand "Doe's," who are identified only as co-conspirators of the named defendants. The AGCC and the Unions have, for many years, entered into collective bargaining agreements. The complaint alleges, in essence, that, despite the existence of those agreements, members of the AGCC, an important construction industry employers' organization, conspired among themselves and with other industry employers to: (1) boycott union-signatory subcontractors, i.e., subcontractors who signed collective bargaining agreements with the Unions; (2) maintain non-union shops and divisions; and (3) breach their collective bargaining agreements with the Unions. The Unions claim this alleged conspiracy violated section 1 of the Sherman Act. The Unions further claim that, through this conspiracy, the AGCC breached its collective bargaining agreements with the Unions, violated California's antitrust statute,[2] and committed the torts of intentional interference with contractual relations and intentional interference with business relationships. The Unions allege antitrust damages of $25 million, to be trebled to $75 million.
 
 
 5
 In an order based largely on the Supreme Court's decision in Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), the district court dismissed the Unions' entire complaint. The court characterized the Unions' antitrust claim as charging that "defendants declined to enter into agreements with plaintiffs to deal only with subcontractors which were signatories to contracts with plaintiffs " 404 F.Supp. at 1070. The district court then dismissed the antitrust claim on the basis of "Connell and the considerable body of case law declining to recognize an antitrust cause of action alleged by a union against an employer in the normal type of labor dispute." Id. As to the Unions' claims for breach of collective bargaining agreements, the court reasoned that such claims were subject to the agreements' mandatory arbitration provisions and that the Unions were therefore required to pursue those dispute resolution procedures first before challenging alleged violations in federal court. Finally, dismissal of the Unions' state law claims was premised on the doctrine of federal preemption.
 
 
 6
 On this appeal, the Unions dispute the position of the AGCC that its conduct is exempt from the antitrust laws by virtue of the labor exemption discussed in Connell. The Unions correctly state that Connell did not purport to exempt anti-union activities on the part of employers from the antitrust laws. On the contrary, Connell held that a union could be liable under the antitrust laws for coercing a "stranger" employer, i.e., one with whom the union had no collective bargaining relationship, to agree not to use non-union subcontractors. The Unions argue that the AGCC's alleged conduct in this case constitutes the "flip side" of Connell, viz., employers conspiring to coerce stranger employers, i.e., those with whom the Unions had no collective bargaining relationship, to agree not to use union-signatory subcontractors. The Unions therefore maintain that their complaint does, consistent with Connell, state a cause of action under the antitrust laws.
 
 
 7
 The AGCC argues that, while conspiracies involving both a union and an employer may give rise to antitrust violations, employer conspiracies directed against unions are not actionable under the Sherman Act. The AGCC also suggests that the Unions do not have standing to bring this action, even if the AGCC did violate the Sherman Act.[3] As to the Unions' breach of contract claims, the AGCC argues that the Unions should have first used contractual grievance procedures, and that their failure to do so rendered those claims vulnerable to dismissal.
 
 
 8
 As to dismissal of their contract claims, the Unions suggest that proceedings on the contract issues should have been stayed, pending arbitration, rather than dismissed. The Unions also argue that their state law claims should not have been dismissed on the basis of federal preemption because those claims were based on conduct undertaken outside of the collective bargaining relationship, and therefore not exclusively governed by federal labor laws.I. SHERMAN ACT CLAIM
 
 
 9
 Section 1 of the Sherman Act declares unlawful "every conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. The Supreme Court has rejected the proposition that every arguable "restraint" falls within the scope of the Act and indicated that a showing of some form of restraint upon commercial competition in the "marketing of goods or services" is a prerequisite to the application of the Sherman Act. Apex Hosiery Co. v. Leader, 310 U.S. 469, 495, 60 S.Ct. 982, 993, 84 L.Ed. 1311 (1940). See also Kennedy v. Long Island Railroad, 319 F.2d 366, 372-73 (2d Cir.), cert. denied, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 61 (1963); Prepmore Apparel, Inc. v. Amalgamated Clothing Workers, 431 F.2d 1004, 1007 (5th Cir. 1970), cert. dismissed, 404 U.S. 801, 92 S.Ct. 21, 30 L.Ed.2d 34 (1971).
 
 
 10
 In its published order, the district court mischaracterized the Unions' antitrust claim as charging that "defendants declined to enter into agreements with plaintiffs to deal only with subcontractors which were signatories to contracts with plaintiffs." 404 F.Supp. at 1070. Our reading of the first amended complaint does not reveal the basis for this characterization, nor can support for the district court's characterization otherwise be gleaned from the record. To accept the district court's characterization would thus require overstepping the boundaries of the complaint, which federal courts are precluded from doing when ruling on motions to dismiss. Fed.R.Civ.P. 12(b). See Walling v. Beverly Enterprises, 476 F.2d 393, 395 (9th Cir. 1973).
 
 
 11
 What the Unions' first amended complaint does allege is that the AGCC conspired to coerce "owners of land and other letters of construction contracts to hire contractors and subcontractors who are not signatories to collective bargaining agreements with plaintiffs."[4] The Unions also allege that members of the AGCC coerced and aided each other to subcontract only with subcontractors who had not signed with the Unions. The situation described by these allegations is very similar to a concerted refusal to deal, or a group boycott, which have both been held to constitute Sherman Act violations.[5]
 
 
 12
 In Connell, the defendant union picketed the plaintiff general contractor to compel it to do business exclusively with plumbing and mechanical work subcontractors who had signed contracts with the defendant union. No collective bargaining relationship existed or was contemplated between the defendant union and the plaintiff general contractor. Indeed, the union had no interest in organizing the general contractor's own employees. To halt the picketing, the general contractor, under protest, finally signed the agreement demanded by the union to employ union signatory subcontractors exclusively. The general then brought suit alleging that the union's conduct violated sections 1 and 2 of the Sherman Act. The Supreme Court reversed the district court's finding, affirmed by the Fifth Circuit, that the union's conduct fell within labor's exemption from the antitrust laws, and remanded for consideration of the Sherman Act claims.
 
 
 13
 Writing for the Court, Justice Powell reasoned that if the union's conduct were held exempt from the antitrust laws, a more efficient nonunion subcontractor, paying wage rates and fringe benefits equal to or lower than those obtained by the defendant union, would be precluded from competing against union subcontractors for Connell's plumbing and mechanical work. Because such conduct could impose a direct restraint on the business market which would affect competition for goods and services in ways that would not follow naturally from elimination of competition over wages and working conditions, the union's conduct, the Court found, could be the basis of a federal antitrust suit. 421 U.S. at 635, 95 S.Ct. at 1841.
 
 
 14
 The Unions' allegations, contained in the first amended complaint, present virtually the obverse of the situation described in Connell. The AGCC allegedly sought to coerce owners of property, general contractors, and "other letters of construction contracts," with whom the Unions had no collective bargaining relationship, to hire only construction firms, primarily subcontractors, who had not signed with the Unions. Such conduct could well restrain competition since success in getting others to adhere to the conspiracy would effectively lock union-signatory subcontractors out of a portion of the market for carpentry work. More efficient subcontractors who had signed with the Unions and were paying wage rates and fringe benefits equal to or lower than those paid by nonunion subcontractors would be precluded from competing for carpentry work required by those who had not signed with the Unions. Thus, the rationale underlying Connell would seem to apply with at least equal force to this case. Absent a valid exemption from the antitrust laws, the employers' group here, like the union in Connell, may be found to have violated the Sherman Act.[6]
 
 II. LABOR'S ANTITRUST EXEMPTIONS
 
 15
 Even if its alleged conduct violated section 1 of the Sherman Act, the AGCC argues that it could not be held liable for such a violation by virtue of labor's exemption from the antitrust laws. According to the Supreme Court in Connell, labor's exemption may be divided into two categories: (1) the statutory exemption, a product of several statutes, and (2) the nonstatutory exemption, based on "the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions " 421 U.S. at 621-622, 95 S.Ct. at 1834.
 
 A. The Statutory Exemption
 
 16
 Labor's statutory exemption from the Sherman Act is embodied in sections 6 and 20 of the Clayton Act, 15 U.S.C. § 17 and 29 U.S.C. § 52; and sections 1 through 15 of the Norris-LaGuardia Act, 29 U.S.C. §§ 101 to 115.
 
 
 17
 Section 6 of the Clayton Act, 15 U.S.C. § 17, provides that labor unions are not unlawful, and that neither the unions nor their members may be considered illegal combinations or conspiracies in restraint of trade. Section 20 of the Clayton Act, 29 U.S.C. § 52, and section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, prohibit courts from issuing injunctions against certain specified activities arising from labor disputes.[7] Section 20 of the Clayton Act has also been construed to provide that conduct made non-enjoinable by the Clayton and Norris-LaGuardia Acts cannot be held to violate any federal law.[8] Thus, conduct made non-enjoinable by these acts is also exempt from the antitrust laws.
 
 
 18
 Defendants here are a group of construction industry employers. The statutory exemptions from the antitrust laws found in the Clayton and Norris-LaGuardia Acts were, however, "designed primarily to protect working men in the exercise of organized, economic power, which is vital to collective bargaining." Brotherhood of Railroad Trainmen v. Chicago River and Indiana Railroad, 353 U.S. 30, 40, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957). See also Cordova v. Bache & Co., 321 F.Supp. 600, 605-06 (S.D.N.Y.1970). Given the statutory exemption's pro-labor purpose, how does the AGCC, an employers' group, expect to benefit from the exemption?
 
 
 19
 Although the AGCC appears to be claiming the statutory exemption, the AGCC fails to cite any specific statutory language in support of its claim. The only language that we have been able to find in the statutes that might conceivably benefit the AGCC is the following excerpt from section 20 of the Clayton Act:
 
 
 20
 (I)n any case between employers and employees involving, or growing out of, a dispute concerning terms or conditions of employment
 
 
 21
 no injunction shall prohibit any person or persons, whether singly or in concert, from ceasing to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States.
 
 
 22
 29 U.S.C. § 52.
 
 
 23
 Under this section, the AGCC's alleged conduct might be characterized as merely "recommending or persuading others" not to let contracts to union-signatory subcontractors, thereby exempting the conduct from the operation of the Sherman Act. The AGCC cannot benefit from this statutory exemption, however, for two reasons: (1) the exemption has not been extended to anticompetitive conduct involving groups of businessmen, and (2) such an extension, exempting antiunion conduct on the part of business groups, would be totally inconsistent with the pro-labor purpose for which section 20 was enacted.
 
 
 24
 To be exempt from the antitrust laws, the conduct described in section 20 must arise out of "a dispute concerning terms or conditions of employment." The Clayton Act does not define the phrase "a dispute concerning terms or conditions of employment" used in section 20. For this reason, the broad definition of "labor dispute" found in section 13(c) of the Norris-LaGuardia Act, 29 U.S.C. § 113(c), has been read into section 20 on the ground that, in section 13(c), Congress defined its concept of "labor dispute" in terms that "no longer leave room for doubt." United States v. Hutcheson, 312 U.S. 219, 234, 61 S.Ct. 463, 467, 85 L.Ed. 788.[9] Section 13(c) of the Norris-LaGuardia Act defines "labor dispute" as "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." The AGCC's alleged conspiracy to persuade others not to deal with subcontractors who signed with the Unions might be said to fall within section 13(c)'s broad definition of labor dispute, as either a dispute "concerning terms or conditions of employment" or one "concerning the association or representation of persons in negotiating terms or conditions of employment." The Supreme Court, however, has refused to apply section 20 to exempt anticompetitive conduct involving employer groups, even though the conduct, which also involved labor unions, might have been said to arise out of a "labor dispute" as defined in the Norris-LaGuardia Act. In Allen Bradley Co. v. Local 3, Int'l Brotherhood of Electrical Workers, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), the Court held that a union and an employer group that conspired to restrain trade were guilty of violating the antitrust laws even though the conspiracy developed from a labor dispute between the union and the employer group. Although the Court noted that the union's conduct fell squarely within the "specified acts" declared by the Clayton and Norris-LaGuardia Acts not to be violations of federal law, 325 U.S. at 807, 65 S.Ct. at 1538-1539, the Court declared that the purpose of the antitrust laws was to outlaw business monopolies and that "(a) business monopoly is no less such because a union participates " Id., 325 U.S. at 811, 65 S.Ct. at 1540.[10] The Court further explained that:
 
 
 25
 The primary objective of all the Anti-trust legislation has been to preserve business competition and to proscribe business monopoly. It would be a surprising thing if Congress, in order to prevent a misapplication of that legislation to labor unions, had bestowed upon such unions complete and unreviewable authority to aid business groups to frustrate its primary objective. For if business groups, by combining with labor unions, can fix prices and divide up markets, it was little more than a futile gesture for Congress to prohibit price fixing by business groups themselves.
 
 
 26
 325 U.S. at 809-810, 65 S.Ct. at 1540.
 
 
 27
 To summarize: In the context of a labor dispute, section 20 of the Clayton Act and section 4 of the Norris-LaGuardia Act, which were primarily designed to promote labor organization, exempt from the antitrust laws anticompetitive conduct on the part of labor unions acting alone. The statutory exemption embodied in those acts has not, however, been extended to immunize anticompetitive conduct involving unions and businessmen acting together, even where such conduct might promote labor organization, because such an extension would effectively negate the prohibitions against anticompetitive business conduct contained in the antitrust laws. A fortiori, if the statutory exemption is inapplicable to business group conspiracies involving unions, the exemption cannot be read to immunize anticompetitive conduct on the part of employers acting alone.
 
 
 28
 In United States v. United Mine Workers of America, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947), the Court also explained that since the restrictions on injunctions found in the Clayton Act are less comprehensive than those found in the later-enacted Norris-LaGuardia Act, the Clayton Act does not deprive federal courts of jurisdiction to grant injunctive relief in any case in which they are not specifically deprived of such jurisdiction under the Norris-LaGuardia Act.[11] In short, the Norris-LaGuardia Act limits the injunctive powers of federal courts to a greater extent than does the Clayton Act, rendering superfluous the Clayton Act's limits on the injunctive powers of federal courts' and the concomitant limits on the scope of the statutory exemption.
 
 
 29
 The situations in which federal courts are deprived of jurisdiction to issue injunctions in labor disputes under the Norris-LaGuardia Act are listed in the footnote.[12] Since the AGCC's alleged conduct does not fit within any of the categories therein listed, such conduct is not non-enjoinable and therefore the AGCC may not claim the benefit of the statutory antitrust exemption.[13]
 
 
 30
 Our determination that the AGCC cannot benefit from the statutory exemption embodied in the Norris-LaGuardia Act and section 20 of the Clayton Act is further supported by the purposes for which those acts were passed. Before the passage of those acts, employers frequently sought injunctions to frustrate labor unions' organizational drives. That the limitations on the federal injunctive power embodied in these acts were designed primarily to promote the organization of labor unions is well illustrated by the policy statement found in section 2 of the Norris-LaGuardia Act:
 
 
 31
 Whereas under prevailing economic conditions, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization ; therefore, the following definitions of and limitations upon the jurisdiction and authority of the courts of the United States are enacted.
 
 
 32
 29 U.S.C. § 102. Thus the statutory exemption may not be construed to exempt a conspiracy of employers to destroy a particular union through a boycott of union-signatory subcontractors because such conduct is completely antagonistic to the pro-labor purposes for which the acts containing the labor exemption were enacted.
 
 B. The Nonstatutory Exemption
 
 33
 In Connell, the Court explained that some of its earlier decisions, e. g., Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), created what the Court referred to as a limited "nonstatutory" exemption from antitrust sanctions for some union-employer agreements. 421 U.S. at 622, 95 S.Ct. at 1835. This exemption "has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions," and promotes "a proper accommodation between the congressional policy favoring collective bargaining under the NLRA (National Labor Relations Act) and the congressional policy favoring free competition in business markets " Id.
 
 
 34
 It is apparent from the discussion in Connell that the nonstatutory exemption may be invoked only in cases involving agreements between unions and employers on wages or working conditions. The AGCC therefore cannot claim the exemption because its alleged conduct neither involved an agreement with a union nor confined itself to matters involving wages or working conditions. See Mackey v. National Football League, 543 F.2d 606, 614 (8th Cir. 1976), cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977).
 
 III. STANDING
 
 35
 The Unions filed their complaint as a class action under Fed.R.Civ.P. 23(a), on behalf of their affiliated local unions and district councils.[14] The AGCC claims that the Unions lack standing to bring the action "on behalf of" their affiliated locals because they failed to allege two of the prerequisites to maintenance of a class action under Fed.R.Civ.P. 23(a): (1) that the Unions' claims are typical of the class, and (2) that the Unions can fairly and adequately represent the members of the class.
 
 
 36
 Since the district court did not address the sufficiency of the class action allegations when it dismissed the complaint, that question will be deferred to the district court on remand. In this opinion, for purposes of determining whether dismissal was appropriate, we need only address the issue of whether, based on the defendants' alleged conduct, persons in the position of the Unions below would have standing to bring an action under the antitrust laws.
 
 
 37
 The statutory basis for private antitrust damage actions is section 4 of the Clayton Act, 15 U.S.C. § 15. That section confers the right to sue for treble damages on "(a)ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws " On its face, this language seems to grant a private right of action to anyone who can prove "factual causation," i. e., that an injury to his "business or property" was caused by an antitrust violation. See In re Multidistrict Vehicle Air Pollution MDL No. 31, 481 F.2d 122, 125 (9th Cir.) (Ely, J.), cert. denied, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973); Bookout v. Schine Chain Theatres, Inc., 253 F.2d 292, 295 (2d Cir. 1958) (L. Hand, J.). Concern that section 4 not become a vehicle for unreasonable damage awards, however, has led courts of appeal and district courts to hold that, to have standing to sue under the antitrust laws, plaintiffs must show not only factual causation but also "legal causation," i. e., that the injury caused was of the type that the antitrust laws were intended to prevent.[15]
 
 
 38
 The Unions have met the factual causation requirement by alleging that, due to the AGCC's conspiracy to establish an industry-wide boycott against all subcontractors with whom the Unions had signed agreements, the Unions have been injured in their business, i. e., organizing carpentry industry employees, negotiating and policing collective bargaining agreements, and securing jobs for their members. What remains to be determined is whether the Union's claim meets the additional requirement of legal causation.
 
 
 39
 Various tests have been formulated to determine whether legal causation has been established. In some circuits, a plaintiff's claim is judged under the "direct injury" rule. This rule permits private actions to be maintained only by those whose injury is considered to be a "direct" or "proximate" result of prohibited anticompetitive activity. See Berger & Bernstein, supra note 15, at 813. Courts adhering to this test focus on the relationship between the alleged antitrust violator and the claimant. Generally, if the claimant is separated from the violator by one or more intermediate tiers of victims, standing is denied by attaching conclusory labels such as "remote," "indirect," and "consequential."[16] This test has been criticized for engendering a tendency to deny standing to a plaintiff who happens to fall within certain "talismanic rubrics" (such as "creditor," "landlord," and "shareholder"), and for arbitrarily foreclosing otherwise meritorious claims simply because another antitrust victim interfaces the relationship between the claimant and the alleged violator. See In re Multidistrict Vehicle Air Pollution MDL No. 31, 481 F.2d at 127.
 
 
 40
 In this circuit, legal causation has traditionally been judged under the so-called "target area" test. Under this test, a plaintiff is said to have standing to sue under the antitrust laws if he was "within the target area of the illegal practices," and "was not only hit, but aimed at." See Karseal v. Richfield Oil Corp., 221 F.2d 358 (9th Cir. 1955). The "target area" has been described as "that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry."[17] Put another way, private antitrust plaintiffs have standing if they are "within the area of the economy which (defendants) reasonably could have or did foresee would be endangered by the breakdown of competitive conditions." In re Western Liquid Asphalt Cases, 487 F.2d 191, 199 (9th Cir. 1973), cert. denied, 415 U.S. 919, 94 S.Ct. 1419 (1974). See also Blankenship v. Hearst Corp., 519 F.2d 418, 425-26 (9th Cir. 1975).[18]
 
 
 41
 Based on the facts alleged in the complaint, injury to the Unions' business was more than merely a "foreseeable consequence" of the AGCC's boycott of union-signatory subcontractors-it was the intended result. Under the target area test then, the Unions' complaint satisfies the legal causation requirement for standing. Moreover, our holding, that a union may have standing to sue an employers' group for conspiring to injure the union by eliminating companies that employ the union's members from the service market, conforms with several recent decisions in which employee groups have been permitted to maintain private antitrust actions on the ground that they were within the target area of the defendant's antitrust activities.[19] See, e. g., Hennessey v. National Collegiate Athletic Ass'n, 564 F.2d 1136, 1147-1148 (5th Cir. 1977); Tubgboat, Inc. v. Mobile Towing Co., 534 F.2d 1172, 1176-77 (5th Cir. 1976) ("Unions are in the business of representing employees. If their ability to organize workers is injured by a conspiracy involving employers, the union's ability to attract membership and represent employees is weakened (The union's) allegations that Tugboat conspired to reduce labor costs by preventing (the union) from providing or representing Tugboat's employees is aimed as much at those parties as it is at (their employer)."); International Ass'n of Heat & Frost Insulators v. United Contractors Ass'n, 483 F.2d 384, 397-98 (3d Cir. 1973), amended, 494 F.2d 1353 (3d Cir. 1974); Robertson v. National Basketball Ass'n, 389 F.Supp. 867, 884-89 (S.D.N.Y.1975). See also Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957) (football players permitted to sue the NFL and its member teams to remedy an alleged boycott).
 
 IV. BREACH OF CONTRACT CLAIMS
 
 42
 In their first amended complaint, the Unions alleged the following breaches of the collective bargaining agreement: (1) failure to pay agreed-upon wages, (2) failure to use the hiring hall, (3) failure to pay trust fund contributions, (4) failure to observe "other" terms and conditions of employment, and (5) "generally weakening the good-faith requirement of the collective bargaining agreements."
 
 
 43
 In their briefs, both sides indicate that the proper way to proceed on these claims, in the first instance, was through the grievance procedures created by the broad arbitration clauses found in the applicable collective bargaining agreements. The sole issue still in dispute as to these claims for breach of collective bargaining agreements is whether the claims should have been stayed pending arbitration rather than dismissed.
 
 
 44
 A review of both the cases cited by the parties and the recent decision of this court in Leyva v. Certified Grocers of California, 593 F.2d 857 (9th Cir.), cert. denied, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979), indicates that, as to breach of contract claims prematurely filed in federal court, a district court may, under general equatable principles, decide that circumstances justify issuing a stay pending arbitration rather than dismissal.[20] We are aware of no case, however, which would support the proposition that a district court must order a stay rather than dismissal at the request of the party responsible for prematurely filing the arbitrable claim in federal court. Moreover, the Unions have asserted no special circumstances, such as statute of limitations concerns or bad faith conduct by the opposing side in failing to make timely assertion of the applicability of the arbitration clause, which might, in some cases, be found to justify reversal of a lower court's denial of a stay. We therefore affirm the trial court's denial of a stay pending arbitration on the Unions' claims for breach of collective bargaining agreements.V. CLAIMS BASED ON STATE LAW
 
 
 45
 The Supreme Court has adopted a broad rule of federal preemption under the labor laws, requiring preemption not only of laws which might interfere with federally protected activities, but also preempting many state remedies which are basically consistent with the aims of federal labor law. See R. Gorman, Labor Law 776-770 (West 1976).
 
 
 46
 A few state tort remedies, for conduct marked by violence and imminent threat to the public order, have been allowed to supplement remedies provided by federal law on the ground that the state remedies represent a compelling state interest. See San Diego Building Trades Council v. Garmon, 359 U.S. 236, 247-48, 79 S.Ct. 773, 781, 3 L.Ed.2d 775 (1959). State remedies for non-violent business-related torts, however, are preempted by federal law, since most such claims are based on conduct capable of being characterized as unfair labor practices, which are within the National Labor Relations Board's primary jurisdiction under the NLRA, 29 U.S.C. § 160. See Garner v. Teamsters Local 776, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953). The district court therefore properly dismissed the Unions' tort claims for intentional interference with business and contractual relations.
 
 
 47
 The Unions' remaining state law claim was based on a California antitrust statute.[21] The Court in Connell held that the use of state antitrust law to regulate union activities in aid of organization must be preempted because it creates a substantial risk of conflict with policies central to federal labor law. 421 U.S. at 637, 95 S.Ct. at 1842. Although the Court's holding in Connell was limited to union organizational activities, the Court's reasoning for holding that application of state antitrust law was preempted is equally applicable to the Unions' claim in this case:
 
 
 48
 (T)he accommodation between federal labor and antitrust policy is delicate. Congress and this Court have carefully tailored the antitrust statutes to avoid conflict with labor policy not only by delineating exemptions from antitrust coverage but also by adjusting the scope of the antitrust remedies themselves State antitrust laws generally have not been subjected to this process of accommodation Permitting state antitrust law to operate in this field could frustrate the basic federal policies.
 
 
 49
 Id.
 
 CONCLUSION
 
 50
 The Unions' allegation, in essence, that defendants conspired to boycott subcontractors who signed with the plaintiff Unions, states a claim for relief under section 1 of the Sherman Act for conspiracy in restraint of trade. Since the defendants' alleged conduct is not exempt from antitrust liability under either the statutory or nonstatutory labor exemption, the district court's dismissal of the Unions' federal antitrust claim is reversed. The district court's refusal to order a stay of proceedings, pending arbitration on the Unions' claims for breach of the collective bargaining agreement, was not improper, and is therefore affirmed. The dismissal of the Unions' business tort and state antitrust law claims, based on the doctrine of federal preemption, is also affirmed.
 
 
 51
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 APPENDIX I
 
 52
 1. Bay Counties District Council, and Local Unions Nos. 22, 34, 35, 36, 42, 102, 162, 194, 478, 483, 550, 642, 848, 1068, 1149, 1158, 1408, 1473, 1622, 1861, 2046, 2095, 2164, 2565, and 3116.
 
 
 53
 2. Central California District Council, and Local Unions Nos. 1959, 2559, 2561, 2652, 2687, 2688-S, 2707-S, 2728-S, 2749-S, 2762-S, 2801, 2838-S, 2927-S, 3088, 3170-S, 2882, and 3184-S.
 
 
 54
 3. Delta-Yosemite District Council, and Local Unions Nos. 266, 386, 1235, 1418, and 1869.
 
 
 55
 4. Golden Empire District Council, and Local Unions Nos. 1240, 1254, 1495, 1599, 1970, and 2043.
 
 SNEED, Circuit Judge, dissenting:
 
 56
 I respectfully dissent.
 
 
 57
 The proper disposition of this case turns on what is the proper characterization of the plaintiffs' complaint. The majority characterize it as alleging an agreement "to coerce owners of property, general contractors, and 'other letters of construction contracts,' with whom the Unions had no collective bargaining relationship, to hire only construction firms, primarily subcontractors, who had not signed with the Unions." P. 532. When so characterized the majority concludes that the "flip side" or obverse of Connell Construction Co. v. Plumbers & Steamfitters Local 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), compels the conclusion that an antitrust cause of action was properly alleged by the complaint.
 
 
 58
 It is my view that the majority has mischaracterized the complaint. The district court's characterization was proper. The pertinent portion of its Memorandum and Order in which the proper characterization appears is set forth is as follows:
 
 
 59
 In the present case, the plaintiff unions claim that defendants have violated the antitrust laws by conspiring among themselves to deter plaintiff unions from organizing the subcontractors with whom the defendant contractors deal. The essence of plaintiffs' claim seems to be that defendants violated the antitrust laws insofar as they declined to enter into agreements with plaintiffs to deal only with subcontractors which were signatories to contracts with plaintiffs, precisely the type of agreement which subjected the union in Connell to antitrust liability. Defendant employers are accused of conspiring in certain activities which would not have a "potential for restraining competition in the business market in ways that would not follow naturally from elimination of competition over wages and working conditions." Connell, supra, 421 U.S. 635, 95 S.Ct. at 1841, 44 L.Ed.2d at 433. Consequently, in light of the explicit holding and discussion in Connell and the considerable body of case law declining to recognize an antitrust cause of action alleged by a union against an employer in the normal type of labor dispute, plaintiffs' first cause of action under the antitrust laws must be dismissed. (Italics added.)
 
 
 60
 California State Council of Carpenters v. Associated General Contractors, 404 F.Supp. 1067, 1070 (N.D.Cal.1975).
 
 
 61
 This characterization makes clear that, rather than being the "flip side" of Connell, the antitrust allegations of the complaint set forth a claim which, if sustained by proof, would permit unions to achieve precisely what Connell prohibited. That is, employers with whom plaintiffs have no collective bargaining relationship will be eliminated from the relevant market with the resulting impairment of competition. This will come about not because of an agreement by employers with the plaintiffs of the type condemned by Connell, but because the now real threat of antitrust liability will divert virtually all subcontracting to employers having a collective bargaining relationship with the plaintiffs. Those with a taste for irony will no doubt savor the spectacle of Connell self-destructing.
 
 
 62
 The relevant portions of the plaintiffs' first amended complaint are set forth in the margin.[1] Even if it were conceded that the district court's characterization is unduly narrow, it does not follow that the complaint sets forth a cause of action under the antitrust law. The plaintiffs complain about various actions by the defendants that injure them. Their basic injury, as they allege it, is impairment of their ability to represent a greater portion of the workers in the construction industry. The injury, therefore, is to the plaintiffs' organizational and representational efforts. An injury of this type without more is not within the ambit of the antitrust law. Lacking is the restraint upon commercial competition in the marketing of goods and services. See Apex Hoisery Co. v. Leader, 310 U.S. 469, 497, 60 S.Ct. 982, 994, 84 L.Ed. 1311 (1940); Clothing & Textile Workers v. J. P. Stevens & Co., 475 F.Supp. 482 (S.D.N.Y.1979). Injuries to a union's organizational and representational efforts must be redressed pursuant to the terms of the National Labor Relations Act. 29 U.S.C. § 151 et seq. (1976). See Motor Coach Employees v. Lockridge, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971); San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). Whether the Act provides a sufficient remedy is simply not relevant.
 
 
 63
 The majority's effort to escape the conclusion that the complaint states a cause of action not justifiable under the Sherman Act requires that the complaint be characterized as alleging a conspiracy directed at two groups of employers. According to the majority, the complaint alleges a conspiracy directed at, first, employers which otherwise would enter into collective bargaining agreements with the plaintiffs. In this fashion the complaint is brought within the Sherman Act in accordance with the authorities set forth in footnote five of the majority opinion.
 
 
 64
 It is doubtful that a significant injury to these employers is alleged. The "loss" of the benefits of a collective bargaining relationship with the plaintiffs cannot be assumed to constitute an economically significant injury in view of the economic realities of employer-employee relations. Employers without collective bargaining agreements with the plaintiffs may make more profit than those who have such agreements. Their absence from this lawsuit constitutes some evidence of their evaluation of their "injury." To the extent they are injured, the injury resembles that suffered by Brer Rabbit when, against his spurious entreaties to be spared such a fate, he was hurled into the briar patch by Brer Fox. Harris, How Mr. Rabbit Was Too Sharp For Mr. Fox, Uncle Remus (Frost ed. 1921). The absence from this suit of these uninjured employers leaves only the plaintiffs' complaint about the alleged injury to their organizational and representational efforts. This is an injury only cognizable under the labor laws.
 
 
 65
 The majority also construes the complaint to allege a boycott of employers which have collective bargaining relationships with the plaintiffs. Here a significant injury to the employers is properly alleged. But this construction of the complaint raises a standing problem. As the majority point out, "In this circuit, legal causation has traditionally been judged under the so-called target area test." P. 537. Under the two-step analysis required by this test, the employers which are directly harmed by the alleged boycott have standing to sue under the Sherman Act. According to the majority so also do the plaintiffs. Under the "target area test," as employed by the majority, both have standing. This is an anomalous result. Instantly it raises the possibility of standing for antitrust purposes of employees, whether unionized or not, whose employer is injured in his business by an unlawful conspiracy. No doubt the employer's injury also hurts his employees. But this court has never permitted a reading of the target area test that would allow the employees of the victim of a boycott to bring an antitrust damage action in the victim's place. Gutierrez v. E. & J. Gallo Winery Co., 604 F.2d 645 (9th Cir. 1979); Contreras v. Grower Shipper Vegetable Association, 484 F.2d 1346 (9th Cir. 1973), cert. denied, 415 U.S. 932, 94 S.Ct. 1445, 39 L.Ed.2d 490 (1974); see Hoopes v. Union Oil Co., 374 F.2d 480 (9th Cir. 1967); Twentieth Century Fox Film Corp. v. Goldwyn, 328 F.2d 190 (9th Cir.), cert. denied, 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964); Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9th Cir. 1955); Conference of Studio Unions v. Loew's Inc., 193 F.2d 51 (9th Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952).
 
 
 66
 However, even if standing might be accorded the plaintiffs on the basis of such cases as Tugboat, Inc. v. Mobile Towing Co., 534 F.2d 1172 (5th Cir. 1976), and International Association of Heat and Frost Insulators v. United Contractors Association, 483 F.2d 384 (3d Cir. 1973), amended, 494 F.2d 1353 (3d Cir. 1974), the essential injury remains one to their organizational and representational ability. Where that is the case labor law provides the comprehensive regulatory scheme sufficient to require that it be treated as having preempted antitrust law. See Clothing & Textile Workers v. J. P. Stevens & Co., supra.
 
 
 67
 When all is said and done, this is a labor case wearing an antitrust costume and inspired no doubt by the employer victory in Connell Construction Co. v. Plumbers & Steamfitters Local 100, supra. It should remain a labor case. I would affirm.
 
 ORDER
 
 68
 Before SNEED, PREGERSON, and ALARCON, Circuit Judges.
 
 
 69
 An active judge of this court requested a vote on the appellant's suggestion for en banc consideration of this court's opinion, filed herein on November 20, 1980. The required vote has been taken, but failed to attain a majority of the active judges of the court. Accordingly, the petition for rehearing is DENIED and the suggestion for rehearing en banc is REJECTED.
 
 
 70
 The Associated General Contractors, in their petition for rehearing en banc, suggested that "The present opinion of the panel could be read as disapproving multi-employer bargaining entirely." To eliminate the possibility that anyone else might read the opinion as rendering multiemployer bargaining or multiemployer bargaining units unlawful, the following explanation is intended to make it clear that California State Council did not, and indeed could not, have that effect.
 
 
 71
 To begin with, there is a vital difference between an agreement designed to promote collective bargaining, and a conspiracy aimed at destroying the collective bargaining process by locking unionized subcontractors out of the subcontracting market. Multiemployer bargaining has long had the approval of both the NLRB and the Supreme Court. See NLRB v. Truck Drivers Local 449 ("Buffalo Linen"), 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957); R. Gorman, Labor Law § 6 at 87 (1976), the NLRB rules permit multiemployer bargaining units if all parties, union and employer, consent or agree to bargain on a multiemployer basis. NLRB, Twenty-Third Annual Report 36 (1958); 4 T. Kheel, Labor Law § 14.03(4)(b) (1979). Such consent or agreement will normally be demonstrated by a substantial history of collective bargaining on that basis. Id.; R. Gorman, supra. The certification of a multiemployer bargaining unit therefore involves more than just an agreement among employers it also requires the consent or agreement of the unions and the approval of the NLRB.
 
 
 72
 In California State Council, the union did not claim that it was somehow injured by the formation of multiemployer bargaining units. Indeed, as the complaint stated, the union collectively bargained with the AGCC, a multiemployer bargaining unit, for nearly twenty years. On the contrary, what was alleged in California State Council was that the AGCC conspired to coerce employers with whom the union had no collective bargaining relationship to agree not to hire subcontractors who had signed with the union. It was on the basis of this conduct, the equivalent of a group boycott and the obverse of the union conduct condemned in Connell, that the majority found that a claim had been stated under the Sherman Act.
 
 
 73
 Agreements among employers are not, in themselves, violative of the Sherman Act. To state a claim under the Sherman Act, one must allege that such an agreement has either an anticompetitive purpose or a substantial anticompetitive effect. L. Sullivan, Antitrust 194, 303-04 (1977). See also Neeld v. National Hockey League, 594 F.2d 1297, 1298 (9th Cir. 1979); Alpha Distributing Co. v. Jack Daniel Distillery, 454 F.2d 442, 452 (9th Cir. 1972). Thus, many innocent agreements among employers, such as the bylaws of national and local chambers of commerce, could not possibly be thought to fall within the Sherman Act.
 
 
 74
 Moreover, mere elimination of competition over wages and working conditions cannot give rise to an antitrust claim.[1] The Supreme Court stated the applicable test in Connell as follows:
 
 
 75
 (An) agreement, which is outside the context of a collective bargaining relationship and not restricted to a particular jobsite, but which nonetheless obligates (a company) to subcontract work only to (certain firms), may be the basis of a federal antitrust suit because it has a potential for restraining competition in the business market in ways that would not follow naturally from elimination of competition over wages and working conditions.
 
 
 76
 421 U.S. at 635, 95 S.Ct. at 1841 (emphasis added). Thus, although multiemployer bargaining units may affect or restrain competition in the area of wages and working conditions, such restraints will not be considered to violate the antitrust laws. Accordingly, the question of whether multiemployer bargaining units may be exempt under one of the labor antitrust exemptions need not arise.
 
 
 77
 At any rate, even if the antitrust laws had been interpreted so as to bring multiemployer bargaining units within the scope of the Sherman Act, the statutory exemption found in section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, when read together with section 20 of the Clayton Act, 29 U.S.C. § 52,[2] clearly exempts "(b)ecoming or remaining a member of any employer organization" from the antitrust laws. 29 U.S.C. § 104(b).
 
 
 78
 In summary, an employer agreement falls within the prohibitions of the Sherman Act only if it has an anticompetitive purpose or effect on some aspect of competition other than competition over wages or working conditions. Certification of multiemployer bargaining units involves not just an agreement among employers but also the consent or agreement of the unions and the approval of the NLRB. Moreover, membership in multiemployer organizations is expressly made exempt from the antitrust laws under the statutory exemption found in section 4 of the Norris-LaGuardia Act.[3]
 
 SNEED, Circuit Judge, Dissenting:
 
 79
 I write briefly once more to state that the above order, which I assume is intended to serve as an amendment to, or at least an exegesis on, the opinion of the majority, does nothing to dispel my concern about that opinion. The key sentence in the order is: "(A)n employer agreement falls within the prohibition of the Sherman Act only if it has an anticompetitive purpose or effect on some aspect of competition other than competition over wages or working conditions." This sentence provides neither a "bright line" nor even a discernible "safe harbor" by which multiemployer bargaining units can fashion their conduct to avoid Sherman Act violations.
 
 
 80
 To illustrate, suppose the members of a multiemployer bargaining unit believe that the union's popularity with its members is waning. Would a decision by the unit, unanimously approved by unit members, to bargain aggressively in order to provoke a strike which the unit hopes will lead to loss of union representation by the employees violate the Sherman Act? The unit's decision certainly is designed to have an effect "on some aspect of competition other than competition over wages or working conditions" unless these words are construed so broadly as to lose all plain or ordinary meaning. Moreover, the decision is not designed to enhance collective bargaining. Other illustrations of the uncertainty the opinion of the majority creates appear in the margin.[1]
 
 
 81
 This uncertainty springs from the fact that the court's decision has thrust the arm of the Sherman Act deep into the territory of labor law in a manner and to an extent not presently predictable. Perhaps the decision of the bargaining unit referred to above will lead to an unfair labor practice charge under the National Labor Relations Act. To add to this possibility another consisting of the possible violation of the Sherman Act unwisely suggests the existence of a substantial overlap in the respective spheres of labor and antitrust law. Even if it be assumed that this overlap will only prejudice employers, an assumption I would not make with any confidence, it is a retrogressive step to return labor relations to the uncertain sway of antitrust law.
 
 
 
 [1]
 The affiliated local unions and district councils, on whose behalf the Unions seek to bring this action as a class action, are listed in Appendix I infra
 
 
 [2]
 The Cartwright Act, Cal.Bus. & Prof.Code §§ 16700, et seq
 
 
 [3]
 This issue was not addressed in the district court's order of dismissal
 
 
 [4]
 First Amended Complaint, at 7
 
 
 [5]
 See, e.g., United States v. Women's Sportswear Mfg. Ass'n, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949), in which the inclusion in a collective bargaining agreement of a provision limiting work to union shops which were also members of a trade association was found to violate section 1 of the Sherman Act. ("The trial court found no evidence that the Union participated in making the agreement. And if it did, benefits to organized labor cannot be utilized as a cat's-paw to pull employers' chestnuts out of the antitrust fires."). See also American Medical Ass'n v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943) (attempt by a doctors' organization to induce hospitals not to deal with doctors who engaged in prepaid medicine plans violated section 3 of the Sherman Act); Fashion Originators' Guild v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (agreement among members of a group of dress designers and textile manufacturers to boycott and decline to sell their products to retailers who sold garments copied from designs put out by group members violated the antitrust laws); Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145 (1930) (agreement by film distributors not to deal with any exhibitors who refused to comply with a standard contract provision requiring arbitration of disputes violated section 1 of the Sherman Act); United States v. Hilton Hotels Corp., 467 F.2d 1000 (9th Cir. 1972), cert. denied sub nom. Western Int'l Hotels Co. v. United States, 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 256 (1973) (hotel operators, who organized an association to attract conventions to their city and who sought contributions for their association from hotel suppliers, violated section 1 of the Sherman Act by agreeing to give preferential treatment to suppliers who made contributions and to curtail purchases from those who did not)
 
 
 [6]
 We note that the AGCC's alleged conduct, in addition to giving rise to antitrust liability, might also have provided a basis for unfair labor practice proceedings under §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act (NLRA). In cases like this, however, "where there is an independent federal remedy that is consistent with the NLRA, the parties may have a choice of federal remedies." See Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 635 n. 17, 95 S.Ct. 1830, 1841 n. 17, 44 L.Ed.2d 418 (1975)
 
 
 [7]
 See Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975) ("These statutes exempt specific union activities, including secondary picketing and boycotts, from the operation of the antitrust laws")
 
 
 [8]
 According to the Supreme Court in United States v. Hutcheson, 312 U.S. 219, 231, 61 S.Ct. 463, 466, 85 L.Ed. 788 (1941), in determining "whether trade union conduct constitutes a violation of the Sherman Law the Clayton Act and the Norris-LaGuardia Act (are to be read) as a harmonizing text of outlawry of labor conduct." Activities non-enjoinable under Norris-LaGuardia thus are protected from being made unlawful by virtue of section 20 of the Clayton Act, 29 U.S.C. § 52 ("nor shall any of the acts specified in this paragraph (as non-enjoinable) be considered or held to be violations of any law of the United States")
 
 
 [9]
 See also 312 U.S. at 231, 61 S.Ct. at 466. ("(The Norris-LaGuardia Act) established that the allowable area of union activity was not to be restricted, as it had been in the Duplex case (Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, (65 L.Ed. 349) (1921)), to an immediate employer-employee relation. Therefore, whether conduct constitutes a violation of the Sherman Law is to be determined only by reading the Sherman Law and § 20 of the Clayton Act and the Norris-LaGuardia Act as a harmonizing text of outlawry of labor conduct.")
 
 
 [10]
 See also Los Angeles Meat & Provision Drivers Union Local 626 v. United States, 371 U.S. 94, 99-100, 83 S.Ct. 162, 165, 9 L.Ed.2d 150 (1962) ("It is beyond question that nothing in the anti-injunction provisions of the Norris-LaGuardia Act, nor in the labor exemption provisions of the Clayton Act, insulates a combination in illegal restraint of trade between businessmen and a labor union from the sanctions of the antitrust laws.") (footnotes and citations omitted)
 
 
 [11]
 See United States v. United Mine Workers of America, 330 U.S. 258, 269-271, 67 S.Ct. 677, 684-685, 91 L.Ed. 884 (1947). ("Moreover, it seems never to have been suggested that the proscription on injunctions found in the Clayton Act is in any respect broader than that in the Norris-LaGuardia Act This Court, on the contrary, has stated that the Norris-LaGuardia Act 'still further (narrowed) the circumstances under which the federal courts could grant injunctions in labor disputes.' Consequently, we would feel justified in this case to consider the application of the Norris-LaGuardia Act alone. If it does not apply, neither does the less comprehensive proscription of the Clayton Act; if it does, defendant's reliance on the Clayton Act is unnecessary.") (footnotes and citations omitted). See also United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941)
 
 
 [12]
 No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute from doing, whether singly or in concert, any of the following acts:
 (a) Ceasing or refusing to perform any work or to remain in any relation of employment;
 (b) Becoming or remaining a member of any labor organization or of any employer organization ;
 (c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;
 (d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;
 (e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;
 (f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;
 (g) Advising or notifying any person of an intention to do any of the acts heretofore specified;
 (h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and
 (i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified
 29 U.S.C. § 104.
 
 
 [13]
 See also Group Life & Health Ins. v. Royal Drug Co., 440 U.S. 205, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261 (1979) ("It is well settled that exemptions from the antitrust laws are to be narrowly construed.")
 
 
 [14]
 The entire list of class members, the unions' affiliated locals and district councils, is contained in Appendix I infra
 
 
 [15]
 This judicially-created standing obstacle is based on the phrase "by reason of" in section 4. See Mulvey v. Samuel Goldwyn Prods., 433 F.2d 1073, 1076 (9th Cir. 1970), cert. denied, 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971); Berger & Bernstein, An Analytical Framework for Antitrust Standing, 86 Yale L.J. 809, 811 (1977)
 It is not at all clear that the Supreme Court will ultimately accept these standing limitations. In Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 660, 81 S.Ct. 365, 367, 5 L.Ed.2d 358 (1961), the court said that a treble damage plaintiff need show no more than that there was a violation and that plaintiff was injured. The Court has also stated that the lower courts should "not add requirements to burden the private litigant beyond what is specifically set forth" in the statutes. Radovich v. NFL, 352 U.S. 445, 454, 77 S.Ct. 390, 395, 1 L.Ed.2d 456 (1957). But see Hawaii v. Standard Oil Co., 405 U.S. 251, 262 n.14, 92 S.Ct. 885, 891 n.14, 31 L.Ed.2d 184 (1973) (dicta) ("(L)ower courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.").
 
 
 [16]
 See In re Multidistrict Vehicle Air Pollution MDL No. 31, 481 F.2d at 127; 13 J. O. von Kalinowski, Antitrust Laws and Trade Regulation § 101.02(2) (a) (1980). See, e. g., Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183, 187 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971); Volasco Prods. Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383, 395 (6th Cir. 1962), cert. denied, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963)
 
 
 [17]
 See, e. g., In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d at 129; Mulvey v. Samuel Goldwyn Prods., 433 F.2d 1073 (9th Cir. 1970), cert. denied, 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971); Conference of Studio Unions v. Loew's Inc., 193 F.2d 51 (9th Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952)
 
 
 [18]
 Two other circuits, seeking a more flexible approach for judging whether a particular person is the proper party to litigate an antitrust claim, have recently adopted a "zone of interests" test. See Bravman v. Bassett Furniture Indus., Inc., 552 F.2d 90, 99 (3d Cir.), cert. denied, 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977); Cromar Co. v. Nuclear Materials & Equip. Corp., 543 F.2d 501, 505-08 (3d Cir. 1976); Malamud v. Sinclair Oil Corp., 521 F.2d 1142, 1148 (6th Cir. 1975)
 According to the court in Malamud v. Sinclair Oil, both the direct injury test and the target area test "demand too much from plaintiffs at the pleading stage of the case." 521 F.2d at 1149. Inspired by the test for standing in administrative law, i. e., "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statutory or constitutional guarantee in question," the new test recognizes the inadequacy of any one formula and instead relies on a case-by-case determination of whether the plaintiff is one whom Congress intended to protect in enacting the antitrust laws. As applied by the Third Circuit, each case:
 (M)ust be carefully analyzed in terms of the particular factual matrix presented. In making this factual determination courts must look to, among other factors, the nature of the industry in which the alleged antitrust violation exists, the relationship of the plaintiff to the alleged violator, and the alleged effect of the antitrust violation upon the plaintiff. Then, while recognizing that breaches of the antitrust laws have effects throughout society, a court must decide whether this plaintiff is one "whose protection is the fundamental purpose of the antitrust laws."
 Cromar Co. v. Nuclear Materials & Equip. Corp., 543 F.2d at 506.
 This circuit has not previously commented on the zone of interests approach. See Solinger v. A&M Records, Inc., 586 F.2d 1304, 1310 n.5 (9th Cir. 1978), cert. denied, 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979). We note with approval, however, that the zone of interests approach appears to embody a fundamental concern for the policies underlying the antitrust laws and Congress's purpose in creating a private antitrust damage action. That purpose appears to have been twofold: (1) to provide a meaningful compensatory remedy for private harm, and (2) to provide effective enforcement and deterrence by encouraging private parties to bring some of the suits not brought by the government. See Berger & Bernstein, supra note 15, at 845-858. We therefore suggest that, in future cases, parties who would be denied standing because they were not "foreseeable victims" under the traditional target area test should still be permitted to litigate their claims if to do so would further the policies underlying the antitrust laws.
 In the analogous field of tort law, in which a defendant who acts with intent to injure another is liable for unforeseen injury to third parties, foreseeability is irrelevant to standing. Since section 4 of the Clayton Act is a remedial statute, designed to compensate victims of illegal acts that are inherently intentional rather than negligent, the systematic denial of standing on foreseeability grounds may result in the dismissal of actions which would otherwise further both the deterrent and compensation purposes of the Act. See footnote 19 infra.
 
 
 [19]
 The seemingly contrary holding of Contreras v. Grower Shipper Vegetable Ass'n of Central California, 484 F.2d 1346 (9th Cir. 1973), cert. denied, 415 U.S. 932, 94 S.Ct. 1445, 39 L.Ed.2d 490 (1974) (per curiam) is distinguishable. In that case farmworker employees were denied standing to sue for loss of work due to an alleged grower conspiracy to fix the price of iceburg lettuce by limiting production and sale of the lettuce. Loss of work, however, was not the intended result of the alleged conspiracy, but only one of its many incidental byproducts. Nor did the farmworkers in Contreras claim to have been totally shut out of the service market, as was the alleged intention of the conspiracy in the instant case. See also Gutierrez v. E. & J. Gallo Winery Co., 604 F.2d 645 (9th Cir. 1979) (per curiam)
 With reference to the discussion of the zone of injury test in footnote 18 supra, we note that Contreras and Gutierrez may be good examples of cases in which injury to a certain plaintiff might not have been foreseeable, but where that plaintiff's suit may further both the compensatory and deterrent purposes of the antitrust laws. Certainly an alleged conspiracy to limit lettuce production artificially could result in injury, whether intended or not, to persons who are highly dependent on that industry. Moreover, it may be that the farmworkers are the only persons available to bring suit. Companies whose business interests are immediately affected by an antitrust violation may not sue because of their stake in an ongoing commercial relationship with the violator. And even if the farmworkers' suit is not necessary to provide a deterrent, because of the availability of other injured parties, any fear of a duplicative or windfall recovery may be allayed by apportionment of damages at time of trial. See Berger & Bernstein, supra note 15, at 858-883.
 
 
 [20]
 See, e. g., Mason-Dixon Lines, Inc. v. Local 560, Int'l Brotherhood of Teamsters, 443 F.2d 807, 809 (3d Cir. 1971) ("a stay of proceedings pending arbitration is within the inherent power of a (district) court")
 
 
 [21]
 The Cartwright Act, Cal.Bus. & Prof.Code §§ 16700, et seq
 Pursuant to said plan, scheme, agreement and conspiracy, defendants and each of them have knowingly, willfully and maliciously committed the following acts:
 (1) Changed names and corporate status without reason, and as a part of the above described plan, agreement, scheme, and conspiracy, in a fraudulent manner;
 (2) Created and maintained double-breasted contracting situations, in which contractors have established and maintained union and non-union divisions, departments, and/or other such entities;
 (3) Advocated, encouraged, induced, and aided non-members of defendant Associated General Contractors of California, Inc. to refuse to enter into collective bargaining relationships with plaintiffs and each of them;
 (4) Advocated, encouraged, induced, coerced, aided and encouraged owners of land and other letters of construction contracts to hire contractors and subcontractors who are not signatories to collective bargaining agreements with plaintiffs and each of them;
 (5) Advocated, induced, coerced, encouraged, and aided members of Associated General Contractors of California, Inc., non-members of Associated General Contractors of California, Inc., and "memorandum contractors" to enter into subcontracting agreements with subcontractors who are not signatories to any collective bargaining agreements with plaintiffs and each of them;
 (6) Held open-shop meetings for members of defendant Associated General Contractors of California, Inc. and non-members, where said members and non-members were induced, encouraged, coerced, and aided to maintain non-union shops, double-breasted operations, and to do and complete all of the activities described herein. These non-members referred to in this subparagraph were both memorandum contractors and non-memorandum contractors.
 (7) Breached the collective bargaining agreements between defendants and each of them and plaintiffs and each of them, by failing to pay agreed-upon wages, by failing to use the hiring hall, by failing to pay Trust Fund contributions, by failing to observe other terms and conditions of employment, and by generally weakening the good-faith requirement of the collective bargaining agreements.
 
 
 [1]
 For some limitations on this rule, see United Mine Workers v. Pennington, 381 U.S. 657, 664-669, 85 S.Ct. 1585, 1590-1593, 14 L.Ed.2d 626 (1965)
 
 
 [2]
 For further elaboration of this point, see California State Council of Carpenters v. Associated General Contractors of California, Inc., 648 F.2d 527 at 533-534 nn. 8 & 9 and accompanying text (9th Cir. 1980)
 
 
 [3]
 In his dissent from this order, Judge Sneed suggests several scenarios of employer behavior that, he says, might constitute conduct violative of the antitrust laws as interpreted by the majority. The majority opinion, like the Court's opinion in Connell Construction Co. v. Plumbers Local 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), was not intended to establish a comprehensive set of rules governing all imaginable future group conduct by employers. The majority simply holds that employers may not be exempt from the antitrust laws when they indulge in conduct directly analogous to the union conduct found to be non-exempt in Connell
 
 
 [1]
 Consider these hypothetical cases:
 
 
 [1]
 Suppose that one or more, but fewer than a majority, of the members of the multiemployer bargaining unit described in the text oppose attempting to destroy the union, but are required to go along with the other employers under the multiemployer bargaining unit's charter. Are the dissenting employers subject to antitrust liability?
 
 
 [2]
 Members of a multiemployer bargaining unit prefer their employees' representative, union X, to union Y, which is attempting to replace union X. Therefore, the employers agree to bargain very easily with union X. May union Y sue the employers under the Sherman Act? Would it matter whether the employers unanimously adopted the strategy or some opposed it?
 
 
 [3]
 Consider this case, which is similar to the employer activity challenged in Part XXIV(6) of the Complaint, reprinted in the dissenting opinion, supra n.1. A multiemployer bargaining unit sponsors a workshop on the law relating to decertification of bargaining representatives under section 9 of the National Labor Relations Act, 29 U.S.C. § 159 (1976). Both members of the unit and other employers attend the workshop, the goal of which is to reduce union representation. May a union representing employees of an employer workshop participant sue under the Sherman Act?
 
 
 [4]
 Members of a multiemployer bargaining unit adopt the following strategy for contract negotiations. The members agree to bargain to impasse and then impose the terms of their final offer. They further agree that no member of the unit may agree to separate terms with the union until the union either accepts the unit's final offer or loses its status as bargaining representative. May the union sue under the Sherman Act, even though this agreement is probably an unfair labor practice under section 8(a)(5), 29 U.S.C. § 158(a)(5) (1976), which requires good faith bargaining?
 In the absence of the majority opinion in this case, each of the hypothetical cases would not suggest an antitrust violation. That is not now the case. Each is hard to distinguish from this case. Each should be treated as a labor case and the antitrust laws should be preempted.